IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § § | |
| | § | 5:17-CR-00821 (1)-OLG |
| vs. | § § | |
| | § § | |
| PEDRO MEZA-GONZALEZ, | § | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable Chief United States District Judge Orlando Garcia:**

This Report and Recommendation concerns the Motion to Suppress filed by Defendant Pedro Meza-Gonzalez. Dkt. No. 20. The district court referred the motion to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Western District of Texas Local Rules CR-58 and Appendix C. On January 12, 2017, the undersigned held a hearing on the motion. After reviewing Meza-Gonzalez's Motion to Suppress, Dkt. No. 20, the Response filed by the Government, Dkt. No. 22, Meza-Gonzalez's Reply, Dkt. No. 27, the Supplemental Briefing filed by the Government, Dkt. No. 31, and Meza-Gonzalez, Dkt. Nos. 32 (Def. 1st Supp. Br.) & 33 ("Def. 2nd Supp. Br."), and the entire record in this case, including the testimony provided at the January 12, 2017 hearing, the undersigned recommends that the motion be **DENIED**.

## I. Background

On September 15, 2017, local law-enforcement officers arrested Meza-Gonzalez for felony possession of a controlled substance. Later, because of that arrest, he came to the attention of federal authorities, who thereafter arrested him for unlawfully re-entering the country without

1

permission to do so, after having previously been removed. *See* 18 U.S.C. § 1326. Meza-Gonzalez takes issue with the legality of the initial search by local police, as well as his subsequent arrest by them, which in turn led ultimately to his federal arrest.

Meza-Gonzalez testified at the January 12 hearing about events surrounding his arrest by local police. Immediately before his arrest, he explained in his testimony, he was legally parked and in the process of searching the backseat of his validly registered and insured vehicle. He was looking for an earring his daughter had lost in the car, which he believed had fallen behind the seat. A local police officer approached him. The officer, according to Meza-Gonzalez, inquired whether he was "Mexican" and then searched his vehicle. The officer discovered a glass pipe and torch lighter. Meza-Gonzalez conceded that the torch lighter was lying on the vehicle's center counsel. But he testified that the officer could not have spotted the glass pipe in plain view. Meza-Gonzalez testified that local police then placed him in handcuffs and asked him questions about his identity, including about his name, address, and nationality. Meza-Gonzalez testified that this occurred before he was administered any *Miranda* warnings. The police then formally arrested him. Next they transported him to the San Antonio Magistrate Office, where he was booked. He was released on bond later that day.

The next day, on September 16, 2017, federal Immigration and Customs Enforcement (ICE) Deportation Officer Stephen Padilla arrived at the San Antonio Magistrate Office to conduct a daily "jail check," a process through which ICE officers identify individuals unlawfully present in the United States who have been arrested by city, county, and state authorities. According to ICE Officer Padilla, who also testified at the January 12 hearing, ICE jail checks are typically performed on a daily basis but manpower issues prevented ICE from coming on September 15—the date of Meza-Gonzalez's booking. A jail check typically entails

2

questioning the individuals in each jail cell regarding their place of birth, after which an ICE deportation officer such as Officer Padilla verifies the information provided with information from either the San Antonio Magistrate Office's computer database, known as CMAGs, or the Bexar County booking system. The deportation officer then typically reviews the San Antonio Magistrate Office's daily physical log books and computer database to determine if any other foreign-born individuals were released the previous day on bond.

After conducting his cell checks the morning of September 16, Officer Padilla asked San Antonio Magistrate Office employees whether they had booked any foreign-born individuals the previous day. In response, an anonymous employee directed Officer Padilla to Meza-Gonzalez's name in the jail's log books. Officer Padilla then searched the CMAGs system for information related to Meza-Gonzalez, and Officer Padilla discovered there that Meza-Gonzalez was indeed foreign born and had been released on bond the previous day. Officer Padilla then obtained a copy of Meza-Gonzalez's mugshot from the Bexar County computer system, which in turn informed him of Meza-Gonzalez's date of birth. Officer Padilla next called the Law Enforcement Support Center ("LESC") operated by the Department of Homeland Security (HSI) and learned that an individual with the same name and date of birth as Meza-Gonzalez had previously been removed in 2007. Officer Padilla then pulled up Meza-Gonzalez's address from CMAGs and verified that Meza-Gonzalez's FBI number matched his record with the LESC.

The investigation continued. After leaving the San Antonio Magistrate's Office, Officer Padilla drove past the address listed for Meza-Gonzalez in CMAGs, which he did to confirm the address's validity. Then, to further confirm Meza-Gonzalez's identity and the validity of the information he had obtained thus far, Officer Padilla used HSI's Enforcement Alien Removal Module database, which logs all encounters with individuals taken into custody for immigration

purposes, to compare Meza-Gonzalez's 2007 mugshot with the 2017 mugshot in the Bexar County database.

At some point between September 16 and September 26, 2017, Officer Padilla obtained a copy of the San Antonio police report, which provided information concerning the circumstances surrounding Meza-Gonzalez's September 15 arrest, his vehicle, and confirmation of his residence. Officer Padilla then conducted surveillance on Meza-Gonzalez's residence and confirmed that a matching vehicle was at the address.

On September 26, ten days after first discovering Meza-Gonzalez's identity and verifying his illegal status, Officer Padilla and other members of his team conducted surveillance on Meza-Gonzalez's residence. One hour later, as Meza-Gonzalez was leaving his apartment, two ICE agents approached him. After verbally confirming his name, the agents placed Meza-Gonzalez in handcuffs. Officer Padilla, who was stationed at a different part of the apartment complex during Meza-Gonzalez's initial apprehension, then came around and notified Meza-Gonzalez that he should never have been released by state authorities because of his immigration record. The agents then read Meza-Gonzalez his *Miranda* rights in the car and transported him to the station. Other than verbally confirming his name, Meza-Gonzalez did not make any statements to the ICE agents prior to his arrest or in the car on the way to the station. It is undisputed that ICE did not obtain a warrant prior to arresting Meza-Gonzalez.

After arriving at ICE's San Antonio resident office, Meza-Gonzalez was digitally fingerprinted in accordance with ICE's standard booking procedures, which automatically generated a list of all Meza-Gonzalez's prior encounters with immigration agents and prior arrests. Officer Padilla then began the process of creating Meza-Gonzalez's I-213, a form ICE agents typically complete when processing an individual who is unlawfully present in the

4

country. This involved "copying and pasting" information from Meza-Gonzalez's prior I-213 and adding additional information relating to his most recent arrest. At some point during this process, Officer Padilla verbally confirmed Meza-Gonzalez's name and re-administered the *Miranda* warnings. Officer Padilla credibly testified that because Meza-Gonzalez exercised his right to remain silent, Officer Padilla refrained from asking Meza-Gonzalez any questions that, if answered, might cause Meza-Gonzalez to incriminate himself. This included refraining from asking questions about whether Meza-Gonzalez possessed fake immigration documents, how he had re-entered the United States, or the circumstances surrounding his prior removal. After completing the I-213, identified as the Government's Exhibit No. 2, Officer Padilla read Meza-Gonzalez the information contained in the form. Officer Padilla then provided Meza-Gonzalez the option to sign the form, which Meza-Gonzalez refused to do. At some point during this process, Meza-Gonzalez expressed confusion regarding his state arrest and denied any wrongdoing in connection with it. In response, Officer Padilla informed Meza-Gonzalez that his arrest by state authorities was between him and the state of Texas. Officer Padilla then advised Meza-Gonzalez that he should consider retaining an attorney. Officer Padilla then ordered Meza-Gonzalez's Alien Registration File ("A-file") from the National Records Center, a division of HSI. Officer Padilla credibly testified that none of the information contained in Meza-Gonzalez's A-file came from statements made by Meza-Gonzalez.

On October 6, 2017, Meza-Gonzalez appeared with counsel before the Honorable Elizabeth S. Chestney for a preliminary and detention hearing. Officer Padilla testified at the hearing. *See* Appendix A to Repl. After considering Officer Padilla's testimony and the information in the pretrial services report, Judge Chestney found probable cause to conclude that Meza-Gonzalez was an illegal alien who had previously been removed, and that he was found in

the United States without permission to re-enter. Judge Chestney also found that pretrial detention was warranted.

On September 26, 2017, Meza-Gonzalez was charged by way of a criminal complaint for being present voluntarily and unlawfully in the United States, having previously been removed on or about April 17, 2007, in violation of 8 U.S.C. § 1326(a) & (b)(1). Dkt. No. 1. On October 18, 2017, Meza-Gonzalez was indicted. Dkt. No. 10. Meza-Gonzalez pled not guilty to the offense as charged, and on December 11, 2017, he filed the instant suppression motion.

## II.    Analysis

By his motion, Meza-Gonzalez seeks to suppress "all evidence" against him "including any sense impressions perceived by officers, oral statements, physical evidence, fingerprints, any identifying evidence, and the A-file." Mot. at 6. In supplemental briefing, Meza-Gonzalez clarifies that he seeks to suppress "all evidence the Government seeks to use against him in this illegal reentry case," which includes:

> all evidence against him, including his name, date of birth, place of birth, address vehicle and its identifying documents, A-file, his alleged statements, his fingerprints, his photographs, observations by state and federal law enforcement agents of his demeanor and behavior between September 15 and 26, evidence derived from the state and federal law enforcement databases used by Agent Padilla (e.g., CMAGs and LESC), and all sense impressions by state law enforcement and federal immigration officers.

Def. 1st Suppl. Brief at 1. Although the Government generally opposes Meza-Gonzalez's motion, the Government concedes that it is barred from presenting the circumstances and evidence found at the time of Meza-Gonzalez's September 15 arrest. Resp. at 6-7. Accordingly, the Government does not intend to present any evidence of Meza-Gonzalez's state arrest for possession of a controlled substance for purposes of this § 1326 prosecution. *Id.*

Meza-Gonzalez's suppression motion is founded on the fruit-of-the-poisonous-tree doctrine, under which all evidence—or "fruit"—obtained "as a direct result" of an illegal search or seizure is typically suppressed. *United States v. Caldwell*, 750 F.2d 341, 343-44 (5th Cir. 1984). Suppression, however, "only extends from the 'tree' to the 'fruit,' . . . if the fruit is sufficiently connected to the illegal tree." *Id.* (quotations omitted). Thus, there are three well-established exceptions to the exclusionary rule that typically calls for suppression of poisoned-fruit evidence in this setting. First, evidence that "has only an attenuated link to the illegally secured evidence" is not subject to suppression. *Id.* (citing *United States v. Ceccolini*, 435 U.S. 268 (1978)). Second, the exclusionary rule does not apply to require suppression "where the derivative evidence would inevitably have been discovered without the aid of illegally obtained evidence." *Id.* (citing *Brewer v. Williams*, 430 U.S. 387, 406 n. 12 (1977) & *United States v. Brookins*, 614 F.2d 1037, 1044 (5th Cir. 1980)). Third, suppression is not required "where the evidence derives from an independent source." *Id.* (citing *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920) & *United States v. Houltin*, 566 F.2d 1027 (5th Cir. 1978)).

*Meza-Gonzalez's Effort to Suppress "All Evidence."* Before addressing the merits of Meza-Gonzalez's motion, a brief discussion of the scope of his requested relief is warranted. Meza-Gonzalez's motion occasionally targets specific pieces or categories of evidence for possible suppression; things like "fingerprints," the "A-file," and the like. *See* Mot. at 6. But the motion also broadly requests "suppression of all evidence" and lists vague, general categories of evidence targeted for suppression, including such things as "oral statements," "sense impressions perceived by officers," "physical evidence," and "any identifying information." *Id.* at 1, 6. As discussed more below, these vague catch-all requests for suppression of "all evidence" cannot be entertained in these circumstances.

Rule 12 provides a defendant the means to discover evidence that the government intends to use in its case-in-chief. It provides:

> At the arraignment or as soon afterward as practicable, the defendant may, *in order to have an opportunity to move to suppress evidence under Rule 12(b)(3)(C)*, request notice of the government's intent to use (in its evidence-in-chief at trial) any evidence that the defendant may be entitled to discover under Rule 16.

Fed. R. Crim. P. 12(b)(4)(B) (emphasis added). Ultimately, "[t]he burden is on [Meza-Gonzalez] to make specific factual allegations of illegality, to produce evidence, and to persuade the court that the evidence should be suppressed." *See United States v. Evans*, 572 F.2d 455, 486 (5th Cir. 1978). That burden cannot be met here unless Meza-Gonzalez first sufficiently identifies the evidence he seeks to suppress.

Meza-Gonzalez's argument for suppression of "all evidence" fails to take fully into account the "mere fact that a constitutional violation" occurred when evidence was obtained does not necessarily mean the evidence must be suppressed. *Hudson v. Michigan*, 547 U.S. 586, 592 (2006) (citing *United States v. Leon*, 468 U.S. 897, 906 (1984) ("Whether the exclusionary sanction is appropriately imposed in a particular case . . . is 'an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.'")); *see also Brown v. Illinois*, 422 U.S. 590 U.S. 590, 603, 607 (1975) (maj. op. & J. Powell concurrence) (rejecting the notion that the fruit-of-the-poisonous tree doctrine requires exclusion of all evidence that would not have been obtained "but for" the Fourth Amendment violation). Moreover, the well-established exceptions to the exclusionary rule reinforce that not all poisoned-fruit evidence must be suppressed. Determining whether an exception applies can turn on the nature of the evidence, which may require specifically identifying the evidence at issue. Finally, the Court is not privy to the pretrial discovery process;

there could be evidence that the Court, at this stage of proceedings, knows nothing about. Entertaining a request to suppress "all evidence" invites an overbroad ruling.[1]

Accordingly, the undersigned will address Meza-Gonzalez's suppression requests that specifically and sufficiently identify the subject evidence; the undersigned cannot grant relief on Meza-Gonzalez's catch-all requests to suppress "all evidence."

*Suppression of Identity Information*. In *Lopez-Mendoza*, the Supreme Court held that "[t]he 'body' or identity of a defendant or a respondent in a criminal or civil proceeding is never itself suppressible as the fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search or interrogation occurred." 468 U.S. 1032, 693 (1984). Although there is now some discussion and even disagreement in the circuit courts about whether a defendant's identity information is suppressible,[2] the issue is well-settled in the Fifth Circuit that such information is not suppressible. *See United States v. Hernandez-Mandujano*, 721 F.3d 345, 351 (5th Cir. 2013) (per curiam) (citing *United States v. Roque-Villanueva*, 175 F.3d 345, 346 (5th Cir. 1999)); *see also United States v. Avelar-Castro*, 27 F. Supp. 3d 686, 694 (E.D. La. 2014) (noting, "as a matter of law, Mr. Avelar-Castro's identifying evidence that resulted from any 'illegal arrest' confirming that he was an illegal alien would not be suppressible"). Accordingly, Meza-Gonzalez's efforts to suppress his identity and identity information fail.

This conclusion is bolstered by Fifth Circuit decisions that emphasize the distinction between poisoned-fruit evidence and *suppressible* poisoned-fruit evidence. In the Fifth Circuit, an alien's A-file, fingerprint information, and other similar identifying information like the

---

[1] For example, without Meza-Gonzalez specifically identifying "the evidence derived from the state and federal law enforcement databases used by Agent Padilla (e.g., CMAGS and LESC)," Def. 1st Suppl. Br. at 1, the undersigned has no way of discerning what particular types of information or evidence this would or might include.

[2] *See, e.g., United States v. Avelar-Castro*, 27 F.Supp.3d 686, 694 (E.D. La. 2014) (recognizing disagreement in the circuit courts).

alien's photographs and name are not suppressible—even if such evidence qualifies as fruit of the poisonous tree. *See, e.g.*, *United States v. Pineda-Chinchilla*, 712 F.2d 942, 944 (5th Cir. 1983) (answering "in the negative" the question asking whether certain government records, including an alien's A-file and the documentary information contained therein, must be "suppressed as the product of an illegal arrest because they are 'the fruits of the poisonous tree'"); *United States v. Roque-Villanueva*, 175 F.3d 345, 346 (5th Cir. 1999) (holding that neither a defendant's identity nor his INS file are suppressible); *United States v. Cervantes-Malagon*, 457 Fed. App'x 364, 365 (5th Cir. Jan. 4, 2012) (confirming that non-suppressible identity information includes an individual's fingerprints).[3] And Meza-Gonzalez recognizes that precedent forecloses his arguments as to the majority of the evidence he seeks to suppress, *see* Mot. at 5; Def. 1st Supp. Br. at 7-8, but provides no persuasive argument for this Court to depart from binding precedent.

Taking a somewhat different approach aimed at the same destination, Meza-Gonzalez next contends that information obtained through the routine booking process is suppressible because authorities obtained it without advising him of his *Miranda* rights. This argument also fails. A defendant's responses to "routine booking questions," such as those inquiring about his name, address, and date of birth, are generally exempted from *Miranda*'s coverage so long as the questions are not "designed to elicit incriminatory admissions." *See Pennsylvania v. Muniz*, 496

---

[3] *See also United States v. Scroggins*, 599 F.3d 433, 450 (5th Cir. 2010) ("Our precedents concerning prosecution for illegal re-entry hold on several grounds that immigration and deportation records are not suppressible, even if officers on the scene become aware of a defendant's immigration status by means of a constitutional violation."); *United States v. Rodriguez–Castorena*, 417 Fed. App'x 409, 409 (5th Cir. Mar. 11, 2011) (noting that because the defendant's fingerprints "did nothing more than identify [the defendant] and did not constitute affirmative evidence of his crime," the fingerprints were not suppressible); *United States v. Baeza–Castillo,* 72 Fed. App'x 170, 171 (5th Cir. Aug. 18, 2003) ("Even assuming that [the defendant's] arrest was illegal," suppression of his fingerprints "is foreclosed by our precedent.").

U.S. 582, 600-01 & n. 14 (1990) (quotation marks omitted). Fingerprinting and photographing of an arrestee receive similar treatment under the law. *See Maryland v. King*, 569 U.S. 435, 465-66 (2013) (justifying via the administrative need for identification a booking exception that allows police to obtain fingerprints, photographs, and DNA without a warrant while booking an arrestee at the police station).

This booking exception applies here, notwithstanding Meza-Gonzalez's contention that it does not. *See* Def. Suppl. Br. at 8, Dkt. No. 32. First, the identification information Meza-Gonzalez provided to local police regarding his name, address, and date of birth is precisely the type of information covered by the exception. Indeed, courts have recognized that biographical information requested and obtained to complete an I-213 form—a form designed to collect prior immigration and personal information that is typically completed by an arresting officer—does not generally implicate *Miranda. See United States v. Palacios*, No. CR H-17-221-01, 2017 WL 2378924, at *4 (S.D. Tex. May 31, 2017) (collecting authorities). With respect to later questioning by federal officers, Officer Padilla credibly testified that he, as well as the other federal agents, merely confirmed Meza-Gonzalez's name, a piece of information that would have inevitably been discovered after running Meza-Gonzalez's fingerprints. *Id.* (even if defendant's statements regarding his alienage were obtained in violation of *Miranda*, these statements would be admissible under the inevitable discovery exception because the information was available on three different databases). Officer Padilla, at the suppression hearing, also specifically and credibly denied having asked Meza-Gonzalez any questions that would cause Meza-Gonzalez to incriminate himself, including whether he possessed fake immigration documents, how he had re-entered the United States, or what the circumstances surrounding his prior removal were.

For all these reasons, suppression of identity information, including Meza-Gonzalez's name, A-file, fingerprints,[4] photographs, address, and date and place of birth, is not warranted.

*Exceptions and Exemptions from Exclusion of Evidence*. There is a further independent basis to deny Meza-Gonzalez's motion. This is because the evidence Meza-Gonzalez seeks to suppress either was procured in manner that is too attenuated from the allegedly illegal stop and seizure to warrant possible suppression or the evidence is not poisoned-fruit evidence at all.

In determining whether there is a sufficient break in the causal chain to deny suppression as a remedy for an alleged unconstitutional search or seizure, courts consider the presence of intervening circumstances and the "purpose and flagrancy of the official misconduct," in addition to the length of time between the arrest and the alleged poisoned-fruit evidence. *Brown*, 422 U.S. at 603-04; *see also United States v. Chavez-Villarreal*, 3 F.3d 124, 128 (5th Cir. 1993). It is undisputed that ten days passed between the search and arrest by state authorities and his subsequent arrest by federal immigration authorities. This delay, coupled with Meza-Gonzalez's voluntary illegal presence in the country, is sufficient to purge any taint resulting from the alleged illegal state arrest, even assuming for argument's sake that the state arrest was illegal. *See, e.g., U.S. v. Alva-Barvosa*, 317 Fed App'x 422, 2009 WL 793041, at *1 (5th Cir. Mar. 26, 2009) (5-day period between the allegedly illegal stop, which led to defendant's arrest on an outstanding warrant, and defendant's placement in ICE's custody, causing ICE to discover the defendant's prior deportation, constituted a sufficient break in the causal chain in events). This ten-day period, in other words, involved "a break in the chain of events sufficient to refute the

---

[4] Fingerprints could perhaps be suppressed were the Government attempting to use them for a purpose other than identification, but that is not the case here. *See, e.g., United States v. Lopez*, No. EP-12-CR-934-PRM, 2012 WL 2254219, at *3 (W.D. Tex. Jun. 15, 2012) (denying suppression motion to the extent the evidence is used merely to establish the defendant's identity but granting the motion to the extent the defendant seeks to exclude use of fingerprint evidence "for any other purpose").

inference that the evidence was a product of the Fourth Amendment violation." *Ward v. Dretke*, 420 F.3d 479, 488 (5th Cir. 2005) (quotation marks omitted).

Meza-Gonzalez's contention that his federal arrest was independently unlawful because it was executed without a warrant and resulted from an allegedly unreliable anonymous tip is similarly without merit. At the time of his September 26 arrest by federal immigration agents, the agents had probable cause to believe that Meza-Gonzalez was in the process of committing a federal crime—being unlawfully present in the country after having previously been removed, while also lacking permission to re-enter. *See Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed.").

That Officer Padilla was only alerted to Meza-Gonzalez's illegal status by virtue of an anonymous tip is not ultimately significant to the issue presented here. Officer Padilla independently verified the reliability of the tip and credibility testified to the steps he took through which he established probable cause. From September 16 through the 26th, Officer Padilla researched state databases to confirm that an individual by the name of Pedro Meza-Gonzalez booked at the San Antonio Magistrate's Office on September 15 was in fact foreign born. Officer Padilla then confirmed with multiple federal databases that an individual with that same name and date of birth was previously removed in 2007 and did not have permission to re-enter the country. Officer Padilla also confirmed that Meza-Gonzalez's mugshot in the Bexar County computer system matched his photograph in the federal database, and that Meza-Gonzalez's vehicle was located at the target address. Finally, before arresting Meza-Gonzalez, federal agents visually matched him with his mugshot. As Officer Padilla credibly testified, the purpose of all of these cross-checks was to ensure that Meza-Gonzalez was the same individual

previously booked at the San Antonio Magistrate's Office and unlawfully present in the country without permission to have re-entered. Accordingly, the results that flowed from Officer Padilla's independent investigation provided the necessary probable cause for Meza-Gonzalez's federal arrest. *See, e.g.*, *United States v. Worthington*, 544 F.2d 1275, 1279 (5th Cir. 1977) (although "an informer's tip is not adequate grounds for an arrest or search absent verified, consistent reliability of the informer [or] an indication of how the informer came by his information . . . if independent investigation by government agents yields information consistent with and corroborative of the informer's tip, the warrantless arrest is legal") (citations omitted).

Nor is there reason to believe that state conduct here was somehow so "purposeful or flagrant" such that exclusion is necessary to deter acts of police misconduct. *See Utah v. Strieff*, --U.S.--136 S. Ct. 2056, 2063 (2016) (explaining that the "third factor of the attenuation doctrine reflects that rationale by favoring exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant"). Meza-Gonzalez urges the Court to apply the exclusionary rule in this case based on his speculation that "[i]t is possible that the SAPD officer, knowing he would not be able to proceed with state court prosecution, acted in order to turn him over to federal authorities." Def. 2nd Suppl. Br. at 5. But this is a bridge too far. There is no evidence to suggest that this was the state officer's intent or that he was at all involved in the anonymous tip that led Officer Padilla to Meza-Gonzalez's presence.

Further, any impressions or observations made by the SAPD officer *prior to* Meza-Gonzalez's detention are not poisoned-fruit. Such impressions or observations of Meza-Gonzalez, including the officer's observation of Meza-Gonzalez's presence in the United States on the day in question, did not result from the officer's allegedly unlawful acts. *See United States v. Hernandez-Reyes*, 501 F. Supp. 2d 852, 861 (W.D. Tex. 2007) (holding that because the

agents' observations of the defendant in the parking lot prior to his detention did not come from exploitation of the illegal seizure, their testimony that the defendant was in the United States on the date of the arrest was admissible).[5] Accordingly, there is no basis to prevent possible trial testimony from the SAPD officer identifying Meza-Gonzalez as an individual he encountered in the United States on September 15, 2017 or any other mental impressions or observations he had before the alleged unlawful search and arrest.

Finally, Meza-Gonzalez's motion, if granted, would essentially effect a bar to the prosecution of the § 1326 charge. But "[a]n illegal arrest, without more, is neither a bar to subsequent prosecution nor a defense to a valid conviction." *Pineda-Chinchilla*, 712 F.2d at 943; *United States v. Garcia-Jordan*, 860 F.2d 159, 160, 162 (5th Cir. 1988) (holding defendant's false statement of citizenship, which was different from any conduct that might have led to the allegedly unlawful stop, was not barred by the exclusionary rule) (citing with approval *United States v. Mitchell*, 812 F.2d 1250, 1253 (9th Cir. 1987) ("We exclude inculpatory evidence when it is obtained as a result of an unlawful search or seizure. We have never, however, applied the exclusionary rule as a bar to the prosecution of a crime.")).[6] This is because the exclusionary rule does "not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." *Wong Sun*, 371 U.S. at 488*; see also Brown*, 422 U.S. at 603, 607 (maj. op. & J. Powell concurrence) (rejecting the notion that the

---

[5] Although any statements Meza-Gonzalez made to the SAPD officer after he was in custody but before he was Mirandized would be suppressible, here, it is uncontested that no such statements exist.

[6] The Fifth Circuit has recognized that "in extreme cases, outrageous police conduct may afford the accused a substantive defense to the prosecution of a crime committed during an illegal stop or detention." *United States v. Smith*, 7 F.3d 1164, 1168 (5th Cir. 1993) (quotation marks omitted). But "[t]his defense is available only where the conduct of the law enforcement officials is so outrageous that it violates notions of fundamental fairness implicit in the Due Process Clause of the Fifth Amendment." *Id*. The facts here do not warrant applying this doctrine. *See id*.

fruit-of-the-poisonous tree doctrine requires exclusion of all evidence that would not have been obtained "but for" the Fourth Amendment violation); *Hudson*, 547 U.S. at 592 ("Our cases show that but-for causality is only a necessary, not a sufficient, condition for suppression.").

## III.     Conclusion

For the reasons discussed above, the undersigned **RECOMMENDS** that the District Court **DENY** Defendant's Motion to Suppress Evidence, Dkt. No. 20.

### Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy by certified mail, return receipt requested, to those not registered. Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court. 28 U.S.C. § 636(b)(1). The party shall file the objections with the clerk of the court, and serve the objections on all other parties. A party filing objections must specifically identify those findings, conclusions, or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections. A party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this report shall bar the party from a *de novo* determination by the district court. *Thomas v. Arn*, 474 U.S. 140, 149-52 (1985); *Acuña v. Brown & Root, Inc.,* 200 F.3d 335, 340 (5th Cir. 2000). Additionally, failure to timely file written objections to the proposed findings, conclusions, and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions

accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

      **IT IS SO ORDERED.**

      SIGNED this 16th day of April, 2018.

**RICHARD B. FARRER**
**UNITED STATES MAGISTRATE JUDGE**